James C. BACKAUS, Respondent,

v.

MURPHY MOTOR FREIGHT LINES,
Self–Insured, Employer,

and

Special Compensation Fund, Relator.

No. C2–88–2642.

Supreme Court of Minnesota.

July 21, 1989.

Hubert H. Humphrey, III, Atty. Gen., Jeffrey Baker, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Raymond R. Peterson, Sieben, Grose, Von Holtum, McCoy & Carey, Minneapolis, for respondent.

COYNE, Justice.

The sole issue before us is the proper computation of the employee's average weekly wage, an issue which in this case turns on the construction and application of Minn.Stat. § 176.011, subd. 3 (1988) (definition of "daily wage") rather than on a factual determination. The employee petitioned for increased temporary partial disability benefits payable as a result of a work-related injury sustained on December 14, 1983. The employer had conceded that the injury arose out of and in the course of employment and had paid compensation benefits on the basis of a weekly wage of $442.06 from the date of injury to March 24, 1986, when the employee complained that the amount of temporary partial disability benefits was being calculated on an incorrect wage rate. The self-insured employer continued to pay benefits until its

declaration of bankruptcy on February 15, 1987, when the Special Compensation Fund became liable for compensation payable to the employee pursuant to Minn.Stat. § 176.183, subd. 1a (1986) (repealed, Act of April 26, 1988, ch. 674, § 22, 1988 Minn. Laws 1050, 1074). It is the Special Compensation Fund which is liable for the increase in compensation resulting from any recomputation of the employee's wage.[1] The compensation judge ruled on December 1, 1987, that the employee's average weekly wage was $668.79 and the Workers' Compensation Court of Appeals affirmed. We reverse.

The employee owned a 1976 IHC semi-tractor which he leased pursuant to a written equipment lease agreement to the Shamrock division of Murphy Motor Freight Lines, Inc., a common carrier holding a certificate from the Interstate Commerce Commission. The lease provided that the owner should furnish the tractor and a driver and that the carrier-lessee should pay as compensation for the use of the equipment and the driver's compensation, if any, 60% of the revenue earned by the equipment after deducting fuel costs. The carrier-lessee was given exclusive possession, control and use of the tractor during the term of the lease. The employee drove the rig himself.

The employee was a member of Teamsters' Union Local No. 487, which had a collective bargaining agreement with the employer. That agreement provided that the employer should pay the owners of leased equipment a percentage of the revenue earned through the use of the equipment as compensation for equipment and drivers. For lease of a tractor only, 60% was the percentage of revenue designated by the collective bargaining agreement. The agreement also provided that the driver was to "be paid by two separate checks to cover wages and equipment rental. It is understood that the driver's share of social security taxes will be withheld from each wage check only." The agreement then set out the different mileage and hourly rates to be paid drivers and, therefore, deducted from the owner's settlement when the truck was used to transport goods to shippers' destination or to transport goods from one of Murphy Motor Freight's terminals to another. The drivers' wages were reported to the Internal Revenue Service on W–2 forms and lease payments on Form 1099.

The compensation judge ruled that the employee's average weekly wage was $668.79, which is the sum of the wage checks from the employer to the employee, plus the owner's settlement check, less the employee's business expenses claimed in Schedule C of his income tax return. The compensation judge did not, however, include in his computation either depreciation of the truck or the value of the employee's investment in this capital equipment.

■ Although we agree with the compensation judge that it is highly unlikely the depreciation claimed for income tax purposes accurately reflects the income derived from a capital investment, the computation of the employee's wage must include some recognition of the return on employee's capital investment. Wages are compensation for labor and services and reflect the worker's ability to earn. Wages include neither the income from capital equipment nor the increment in the value of a business interest arising out of the worker's contributions of capital. We do not suggest that the wages of a carpenter or auto mechanic who brings his or her own hand tools to the job or a worker who furnishes his or her own safety goggles and safety shoes are not fully includible in the computation of the worker's wage rate for workers' compensation purposes. A semi-tractor or tractor/trailer combination, however, represents a very substantial capital outlay, which can be justified economically only if the investment itself can be expected to generate some income. That the parties recognized that ownership of

---

**1.** Following its review of the computation of employee's average weekly wage, the Special Compensation Fund conceded that temporary partial disability benefits should have been calculated on the basis of an average weekly wage of $443.81, an increase of $1.75 in the weekly wage rate.

the semi-tractor was of economic consequence is illustrated by their entry into a formal lease. Moreover, the lease required the owner to furnish both equipment and operator but did not require the owner to be the driver, a clear indication that the driver's wages were unrelated to the owner's personal earning ability. Had the employee retained ownership of the tractor subsequent to his injury, he could have engaged a driver and continued to realize the same return on his investment despite his inability to contribute his labor to the enterprise.

 Ordinarily, of course, the wage rate of an employee who leases equipment to the employer or who contributes capital as the proprietor, partner, or shareholder of a closely held incorporated business presents a question of fact; and the burden of proving what portion of the employee's compensation represents the value of the use of the employee's equipment or the return on capital falls on the employer. In the present case, however, we are of the opinion that, as a matter of law, the burden has been met. Not only have the parties entered into a formal lease of the employee's semi-tractor; the lease comports with the collective bargaining agreement governing the relationship between this employer and this employee. The collective bargaining agreement sets the rent to be paid by the lessor/employer—a percentage of the revenue earned by use of the semi-tractor. The collective bargaining agreement also allocates the rental payment between compensation for labor and return on capital: the employer must first pay the driver's wage based on the union wage scale, withholding appropriate amounts for income taxes and social security, and only then pay the remainder of the rent to the owner. The driver's wage is the same whether the owner or another person operates the vehicle. The arms length negotiations underlying the collective bargaining agreement, which fixes drivers' wages without regard to status as truck owner or nonowner, permits no other conclusion than that employee's wage at the time of his

injury is that set by the collective bargaining agreement.

Reversed.