Rick STEWART, Respondent,

v.

**FORD MOTOR COMPANY,**
**Self–Insured, Relator.**

No. C2–91–89.

Supreme Court of Minnesota.

Aug. 23, 1991.

Mark Ginder and Susan S. Byers, Dorsey & Whitney, Minneapolis, for relator.

Mark J. Fellman, Hertogs, Fluegel, Sieben, Polk, Jones & LaVerdiere, St. Paul, for respondent.

WAHL, Justice.

This case raises for the first time before this court the issue of whether profit sharing payments to an employee should be included in the calculation of the employee's average weekly wage under the Workers' Compensation Act, Minn.Stat. Ch. 176 (1990). The compensation judge included profit sharing in the calculation; the Workers' Compensation Court of Appeals (WCCA) affirmed that decision. Relator/employer Ford Motor Company petitioned for review by writ of certiorari. Because we conclude that profit sharing payments are not part of an employee's average weekly wage, we reverse in part and remand.

Respondent/employee Rick Stewart sustained a work-related back injury on May 9, 1985, while employed by Ford, and Ford accepted liability. Stewart filed a claim petition in November 1988, alleging underpayment of temporary partial disability benefits based on a miscalculation of his average weekly wage. Both parties agree Stewart's weekly earnings were "irregular" under Minn.Stat. § 176.011, subds. 3 and 18 (1990).

The issue before the compensation judge was the proper calculation of Stewart's average weekly wage on the date of injury. Ford calculated Stewart's average weekly wage to be $623.24 (base wage earnings plus overtime, shift payments, and holiday and vacation pay for the 26 calendar weeks prior to the injury, divided by the 22 weeks respondent actually worked during that time). Stewart calculated, and the compensation judge found, his average weekly wage at the time of injury to be $671.62

(base wage earnings plus overtime, shift payments, holiday and vacation pay, "other" payments for short-week payments, utility back pay, and a pro rated share of profit sharing payments Stewart received for the 26 weeks he actually worked during 30 calendar weeks, divided by 26 weeks).

The WCCA affirmed the decision of the compensation judge, treating the profit sharing payments received by Stewart as statutory "allowances" properly included in determining Stewart's average weekly wage. Ford sought review primarily challenging the inclusion of profit sharing payments.

Under the workers' compensation statute, an employee's average weekly wage is determined by multiplying the employee's daily wage [1] by the number of days normally worked per week in the employer's business. Minn.Stat. § 176.011, subd. 18 (1990).[2] "Daily wage" is the daily wage of the employee in the employment engaged in at the time of injury. It does not include tips or gratuities but does include board or allowances made in addition to wages as part of the wage contract. Minn.Stat. § 176.011, subd. 3 (1990).[3] The goal in determining the average weekly wage is to "'arrive at a fair approximation of [the employee's] probable future earning power which has been impaired or destroyed because of the injury.'" *Bradley v. Vic's Welding*, 405 N.W.2d 243, 246 (Minn.1987) (quoting *Knotz v. Viking Carpet*, 361 N.W.2d 872, 874 (Minn.1985)).

As part of the 1984 collective bargaining agreement between Ford and the United Auto Workers union, Ford instituted a profit sharing plan for its employees whereby eligible employees received a percentage of Ford's profits based upon their "eligible pay."[4] In 1985, Stewart received $2,077.25 in profit sharing for 1984 and, in 1986, he received $964.25 in profit sharing for 1985. The pro rated share of those profit sharing payments for the last 26 weeks of Stewart's employment was $696.16, which the compensation judge included in Stewart's average weekly wage calculation as an "allowance."

■ Ford contends profit sharing payments are not includable when calculating an injured worker's disability benefits, arguing primarily that profit sharing is not a

---

1. The workers' compensation statute provides: If the amount of the daily wage received or to be received by the employee * * * was irregular or difficult to determine, * * * the daily wage shall be computed by dividing the total amount the employee actually earned in such employment in the last 26 weeks, by the total number of days in which the employee actually performed any of the duties of such employment * * *.
Minn.Stat. § 176.011, subd. 3 (1990).

2. Subdivision 18 provides in part:
**Weekly wage.** "Weekly wage" is arrived at by multiplying the daily wage by the number of days and fractional days normally worked in the business of the employer for the employment involved. If the employee normally works less than five days per week or works an irregular number of days per week, the number of days normally worked shall be computed by dividing the total number of days in which the employee actually performed any of the duties of employment in the last 26 weeks by the number of weeks in which the employee actually performed such duties * * *.
Minn.Stat. § 176.011, subd. 18 (1990).

3. Subdivision 3 provides in relevant part:
**Daily wage.** "Daily wage" means the daily wage of the employee in the employment en-

gaged in at the time of injury but does not include tips and gratuities paid directly to an employee by a customer of the employer and not accounted for by the employee to the employer. * * * *Where board or allowances other than tips and gratuities are made to an employee in addition to wages as part of the wage contract they are deemed a part of earnings and computed at their value to the employee.*
Minn.Stat. § 176.011, subd. 3 (1990). (emphasis added).

4. An employee's "eligible pay" includes: hourly wages and COLA; vacation, holiday and excused absence pay; performance and attendance bonuses; bereavement, jury duty and military duty pay. It also specifically includes "compensation payments from the Company as the result of a totally disabling occupational injury or disease under any worker's compensation law * * *." Agreement Concerning Profit Sharing Plan for Hourly Employees in the United States at 189. Ford sent out the profit sharing checks, minus withholding, in March of each year for the previous calendar year. Employees can, however, opt to have their payment, or portions of it, placed into Ford's "Tax Efficient Savings Plan." *Id.* at 197.

"wage" or "allowance" pursuant to Minn. Stat. § 176.011, subds. 3, 18, or as defined by the cases. Stewart, citing *Boschee v. Blower*, No. 474–52–4867 (W.C.C.A. August 25, 1989), claims that his profit sharing payments represent wages he actually earned, paid directly to him, to be used at his discretion and on which he was required to pay taxes.[5]

■■■ Not all taxable income is considered "wages" for purposes of computing workers' disability benefits. Wages, for those purposes, are compensation for labor and services which reflect an employee's earning capacity.[6] *Backaus v. Murphy Motor Freight Lines*, 442 N.W.2d 326, 327 (Minn.1989). Conversely, profits which accrue independent of an employee's own efforts generally are not includable in the average weekly wage calculation. *See id.* at 327–28 (income derived from capital equipment not part of wages). *See also* 2 A. Larson, *The Law of Workmen's Compensation* § 60.12(e) (1989) ("Generally, profits from a business, whether commercial or farm, are not considered as wages for purposes of establishing average wage.") Arguably, the employee's share of the company's profits here was not totally independent of his efforts because, at least according to the Plan, the employee "can maximize the amount of any profit sharing he will receive by doing whatever is in his power to increase his eligible pay." This, however, seems to have more to do with the distribution of the profits if there are any, rather than with insurance that there will be profits to be shared. It can also be argued that, where profit sharing is part of a union contract of employment and the employees may end up with less wages for the "gamble," profit sharing might be somewhat akin to remuneration for labor and services. Still, such bonus-type payments to all employees at the end of the year, out of the profits of the employer's business, do not represent the individual efforts of the employee on the line. Rather, the profit sharing here is reflective of Ford's annual financial status, not of the employee's earning capacity, because whether Ford realizes a profit depends largely on factors outside the employee's control, e.g., interest rates, supply and demand, sales, and manufacturing costs. Accordingly, we reverse the WCCA and the compensation judge and hold that profit sharing is not includable in calculating an employee's average weekly wage under the Workers' Compensation Act.[7]

We reverse in part and remand for recalculation of the employee's disability benefits.

---

5. Stewart also quoted the purpose of Ford's Plan as "providing new sources of income" for eligible employees.

6. The compensation judge and the WCCA believed the profit sharing was no different than overtime pay, attendance bonuses and shift differential (extra pay for working graveyard shifts), but these categories of payment are compensation for labor and services.

7. It may be that the system for compensating employees is changing in these economic times. It may also be that labor and management, in negotiating profit sharing and other forms of compensation in lieu of wages, intend such compensation to be considered as wages. If that is the case, then the legislature should address the issue.